IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF ARKANSAS

WESTERN DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 14 2012

JAMES W. McCORMACK, CLERK
By: _____
                    DEP CLERK

MADGERYNE DANCY on her own behalf and as Administratrix of

The estate TANIA L. JONES, Deceased

PLAINTIFF

Vs.

NO. 4-12-CV-0170 BRW

De SAINT-FELIX M.D., CORIZON, INC.,

Nurse Jay Schaulbin, and Roxanna Smarjesse, L.P.N.

This case assigned to District Judge Wilson
and to Magistrate Judge Ray

DEFENDANTS

COMPLAINT

1. This is an action for damages arising under the United States Constitution and the laws of the State of Arkansas. Defendants violated the rights of Tania L. Jones, the deceased Daughter of the plaintiff, under the Eighth Amendment of the Constitution and the laws of the State of Arkansas when Defendants knowingly and with deliberate indifference to her constitutional rights, denied her reasonable medical treatment for a serious medical condition, thereby causing her extensive pain and suffering and ultimately, her death. Defendants' conduct under the color of state law proximately caused the deprivation of decedents federally protected rights. Defendants' willful and wanton conduct also gives rise to supplemental and pendant state claims.

JURISDICTION AND VENUE

2. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331, 1343 and 1367. These claims arise under the Constitution and the laws of the United States, including

provisions of the Eighth and Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. §§ 1983. The Court has pendant and ancillary jurisdiction over Counts Three and Four.

3. Venue is proper in the United States District Court for the Eastern District of Arkansas pursuant to 28 U.S.C. § 1391 because Defendants' conduct hereinafter allegedly occurred within this Judicial district, and the claims also arose in this judicial district.

4. Plaintiff, Madgeryne Dancey is a resident of North Little Rock, Pulaski County Arkansas, and is the duly appointed Administratrix of the estate of her deceased daughter, Tania Jones.

5. Defendant Corizon, Inc. ("CMS") is a for-profit corporation duly organized and existing under the laws of the State of Missouri with headquarters located at 12647 Olive boulevard, St. Louis, Missourri63141. At all times relevant hereto, CMS was a comprehensive health care provider that contracted with the Arkansas Department of Correction to provide medical services at its state correctional facilities, including the McPherson Unit. CMS routinely violated the terms of its agreement with the State of Arkansas, and knew of, supported, adopted, approved and ratified the policy, custom, or practice of ignoring and violating the constitutional rights of patients at the McPherson Unit, including the decedent, Tania Jones.

6. Defendant Dr. De Saint-Felix ("Dr. Saint-Felix") was, at all relevant times, a citizen of the state of Arkansas, licensed to practice medicine in the State of Arkansas, and employed by CMS as the medical director at the McPherson Unit in Newport, Arkansas. Dr. Saint-Felix also, at all relevant times, was under contract with CMS to provide physician services at the McPherson Unit as an "independent contractor." Dr. Saint-Felix was involved individually, directly and in a supervisory capacity in the medical care and treatment being provided to inmate Tania Jones.

7. At all relevant limes Dr. Saint-Felix maintained an on-site office at the McPherson Unit and was scheduled to be on the premises at least 40 hours per week.

8. At all pertinent times mentioned herein, all of the Defendants employed by CMS were acting within the scope of their official duties and their employment, and under color of state law. Their negligence is imputed to their employer under the doctrine of respondeat superior.

FACTS

9. The Hawkins Correctional Unit is the Arkansas Department of Correction's women's penitentiary in Wrightsville, Arkansas. It was first opened in 1998, and was operated by Wackenhut Con'ections Corporation.

10. In July of 2001, the State of Arkansas contracted with CMS, a private for-profit health care services company, to provide medical, dental and mental health care to prisoners incarcerated by the Arkansas Department of Corrections, including the Hawkins Unit. This contract has been renewed in July of 2002, 2003, and 2004.

11. Upon infom1ation and be1ief, it is alleged that in 2004, CMS was paid in excess of thirty five million dollars ($35,000,000) for delivery of a comprehensive medical and dental services program for the Arkansas Department of Correction and the Arkansas Department of 3 Community Corrections. CMS received $1,741,571.40 for providing health care services for ilill1ates at the Hawkins Unit.

12. The contract between CMS and the State of Arkansas states that the health services CMS provides to Arkansas inmates "shall be substantially equal in quality to that afforded the general populace of the State of Arkansas. Services shall reflect current established professional standards for the practice of medicine, dentistry and mental health activities."

13. Upon information and belief, it is alleged that CMS did not provide the required number of qualified personnel at the Hawkins Unit pursuant to contract.

14. CMS contracts to provide health services to more than 212,000 prisoners in 27 states.

15. The United States Department of Justice conducted an investigation of the conditions at Hawkins Unit in 2002 and 2003, while CMS was responsible for providing medical services to Hawkins inmates. The Department of Justice concluded that the constitutional rights of the inmates confined in the Hawkins Unit were violated and that inmates at Hawkins Unit experienced deliberate indifference towards their serious medical needs. These findings were laid out in a thirty five page letter dated November 25, 2003, and addressed to Governor Mike Huckabee.

16. CMS has a national reputation for providing prisoners with grossly inadequate medical care, and despite the findings of the Department of Justice, continued to provide Hawkins Unit prisoners with grossly inadequate access to health care.

17. Medical staff at McPherson routinely ignored requests for urgent care by prisoners with dangerous and painful medical health problems, and CMS staff was taught to not believe anything they are told by prisoners, including complaints of physical illness.

18. Tonia Jones was thirty-one (31) years old when she became incarcerated at the Arkansas Department of Correction, Hawkins Unit.

19. Upon admittance to the Hawkins Unit, Decedent Jones initial report of physical examination listed abnormal findings as being: PMH-dm, asthma, osteoporosis, disc disease, incontinence, loss of use of legs from car accident of 2004.

20. On April 5, 2010, she was transported to St. Vincent Infirmary due to a syncope episode. Inmate Jones was transported from Hawkins without any accompanying prison medical records. Upon admission, her EKG shoed a tachycardia and an incomplete bundle branch block. A BNP was requested with resultant 2681 indicating possible severe cardiac disease.

21. On April 6, 2010, Tania Jones was transported to St. Vincent Health Systems and admitted by attending physician Fakhar Ijaz for a syncope episode that she experienced on April 5, 2010 at the prison.

22. The admitting diagnosis was syncope episode, possibly vasovagal pseudo seizures psychosis, elevated CPK, hypertension, diabetes mellitus, and acute renal failure.

23. The discharge diagnosis was the same, with the addition of elevated creatinine.

24. The decedent complained of chest discomfort, and had an elevated CPK.

25. It was determined that a neurology and cardiology evaluation was necessary to properly evaluate the syncope, and on April 7, 2010, Dr. Ijaz recommended 2-3 days admittance in St. Vincents and that she be placed on telemetry. Further hospital management was to be monitored upon her hospital course with CPK and troponins monitored closely.

26. However, later that day, Dr. Saint-Felix called the hospital and advised that the decedent had a history of malingering, and that they doubted the validity of her symptoms because of her history of malingering. The hospital was advised by Dr. Saint-Felix to return the decedent to the prison, and that she would be observed closely in the prison hospital under the service of Dr. Felix. she was discharged on April 7, 2010 without further testing or evaluations to the prison hospital.

27. Dr. Felix was advised by Dr. Ijaz that the decedent needed to have a CBC, BMP, CPK, and troponins rechecked and the following medications: Amitriptyline 150 mg 3 times a day, Neurontin 600 mg twice daily, baclofen 10 mg 3 times a day, Colace 100 mg twice daily, metoprolol 100 mg twice daily, and at least 5 other medications which were never administered by the prison hospital.

28. On April 11, 2010 at approximately 2032 L.P.N. Roxanna Smarjesse was called to barracks three for decedent Jones who was unresponsive, with inmates attempting mouth to mouth and ambulance was called.

29. Decedent was pronounced dead on April 11, 2010 at approximately 9:50 p.m. by Dr. Casey Smallers, with the immediate cause of death being pulmonary thromboelism which did not exhibit gross changes which occur with increasing age.

30. That but for the negligence of all the above named Defendants, including Dr. Felix, Decedent would not have been deprived of the imminent, competent and necessary medical care that she was receiving while hospitalized at St. Vincents.

31. Tania Jones' death was proximately caused by the above-described actions of CMS, Dr. Felix, and Nurses Schaulbin and Smarjesse of the McPherson Unit. COUNT ONE (42 U.S.c. §§ 1983 -- Failure to Provide Medical Care and Treatment) (Against al1 defendants)

32. Paragraphs 1 through 30 of this Complaint are incorporated by reference as if fully set forth herein.

33. Defendants' actions and pattern of conduct as set forth above violated Tania Jones' Eighth Amendment right to be free from cruel and unusual punishment.

34. Defendants' actions and pattern of conduct as set forth above demonstrated a deliberate indifference to Tania Jones' serious medical needs.

35. CMS, its medical provider employees, and Dr. Felix, demonstrated deliberate indifference to Tania Jones' serious medical needs by, inter alia:

(a) Ignoring her repeated complaints and fears;

(b) delaying and refusing necessary medical treatment for non-medical

reasons;

(c) failing to administer recommended medications, and testing;

(d) denying reasonable requests for treatment which exposed Tania Jones

to physical and emotional suffering and ultimately death;

(e) failing to properly monitor her medical condition; and

(f) preventing Tania Jones from receiving recommended treatment and

Intentionally interfering with appropriate treatment.

36. Defendants' actions were intentionally injurious, callous, willful and intolerable.

37. CMS, through its procedures, customs, policies, and actions, displayed deliberate indifference to the serious medical needs of Tania Jones in the following ways:

a. Failing to maintain adequate medical staffing levels at McPherson. As a result, Tania Jones was not able to see qualified medical personnel when she asked for medical help, which CMS knew was a

violation of its own procedure manual, all community standards, and its contract with the State of Arkansas.

b. Continuing with the same shoddy practices and policies of cutting corners on the Prisoners' medical health needs even after the United States Department of Justice specifically determined that CMS had violated prisoners' constitutional rights. In November of 2003 the Department of Justice specifically found that At McPherson, medical services fall short of constitutional standards in the following areas: emergent, chronic and acute care; intake physicals; referral and consults; and dental services. As explained below, these deficiencies primarily result from inadequate staffing, lack of proper supervision, and the failure to implement consistently the generally adequate written medical policies and protocols.

c. Ignoring, and refusing to follow medical directives given by Dr. Ijaz who was in a better position to treat, and diagnose because of his observations of the decedent.

38. As a result of the violations of her civil rights by CMS, and the negligent and intentional actions of CMS employees, Tania Jones suffered the following injuries:

a. She suffered tremendous physical pain and mental and emotional anguish;

b. She lost the chance to be cured or successfully treated;

c. She lost her life.

d. Her estate lost future income and savings.

COUNT TWO (42 U.S.c. §§ 1983 - Hiring and retaining Dr. Felix; Failure to Train and Supervise) (Against CMS)

39. Paragraphs 1 through 38 of this Complaint are incorporated by reference as if fully set forth herein.

40. Administration, management and providing health care services to inmates of a prison are traditionally state functions.

41. Defendant CMS was under contract with Arkansas' Department of Correction, an entity of the State of Arkansas, to provide medical services at its state correctional facilities, including the McPherson Unit.

42. CMS failed to do a complete and competent background check of Dr. Bardell and prior to hiring him.

43. If CMS' Arkansas administrators did not know of Dr. Felixs' history at the time he was hired to provide medical services, they soon learned of his past problems, and should have terminated his contract immediately.

44. In addition, Dr. Felix exhibited poor medical decision making for a dangerous and hostile attitude towards his patients. CMS was deliberately indifferent to the health and welfare of the McPherson

inmates by not further investigating Dr. Felix and terminating his contract. Rather, CMS chose to deny and cover-up Dr. Bardell's errors and mistakes.

45. Given Dr. Felixs' level of incompetence and his attitude towards prisoners, it was foreseeable that there would be violations of McPherson Unit inmatetes' civil rights.

46. COUNT THREE (State Law Claim for Medical Negligence) (Against defendants Dr. Felix, CMS, Schaulbin and Smarjesse)

47. Paragraphs I through 46 of this Complaint are incorporated by reference as if fully set forth herein.

48. Defendants Dr. Felix, CMS, Schaulbin and Smarjesse had a duty to provide reasonable medical care and treatment to inmates at the McPherson Unit, including Tania Jones.

49. Defendants, one and all breached their duty of care and were negligent when they failed to provide Ms. Jones with reasonably obtainable and necessary medication and emergency medical treatment.

50. CMS is legally responsible to plaintiff for any harm caused by employees acting on its behalf.

51. CMS, through its nurses, agents and employees, failed to exercise reasonable and ordinary care, skill, and diligence, and departed from the generally accepted and recognized standard of care and skill of the medical community in the care and treatment of Ms. Jones. CMS is responsible for the actions of its employees through the doctrine of respondent superior.

52. The negligence, carelessness and/or recklessness of Defendants Felix, Schaulbin and Smarjesse and the CMS employees consisted of, but are not limited to, the following:

(a) Failing to properly evaluate and monitor Tania Jones;

(b) Failing to timely and frequently review her medical' status, including her

blood sugar levels, blood pressure, temperature, respiratory rate, pulse, oxygen level, and

medications;

(c) Failing to recognize and appropriately respond to her distress;

(d) Failing to carry out physician orders from St. Vincents;

(e) Failure to administer and/or prescribe appropriate medications;

(f) Violating various written and unwritten policies, procedures and guideline of

CMS and the Arkansas Depal1ment of Correction;

(g) Failing to consult with and/or timely consult with knowledgeable medical

specialists regarding the care and treatment of Tania Jones;

(h) interrupting the care being provided from a competent hospital;

(i) Remaining deliberately and callously indifferent to Ms. Jones' medical condition.

53. By improperly diagnosing Tania Jones' condition and failing to properly evaluate her symptoms, Dr. Felix acted negligently and did not use ordinary skill and diligence, nor did he apply the means and methods ordinarily and generally used by physicians of ordinary skill and learning to determine the nature of Tania Jones' ailment.

54. By improperly diagnosing Virginia Monis' condition and failing to properly evaluate her symptoms, the CMS nurses at McPherson acted negligently and did not use ordinary skill and diligence, nor did they apply the means and methods ordinarily and generally used by nurses in the medical community of ordinary skill and learning to determine the nature of Ms. Jones' ailment.

55. Although Plaintiff has filed medical care provider affidavits pursuar1t to Act 649(SEE EX. 1), he asserts that the pleading requirements of Ark. Code Ann. §§IG-114-209 are unconstitutional, and have been designated as such by the Arkansas Supreme Court. The Arkansas Rules of Civil Procedure goven the procedures for civil proceedings and the only requirements regarding the content of a complaint to be filed in a civil action, such as a medical malpractice action, are set out in Ark.R.Civ.P. 8. Moreover, Rule II governs actions filed without a good faith basis in law or fact for doing so. In addition, Ark. Code Ann. §§ 16-114-209 is in conflict with Article II, §§ 13 of the Arkansas Constitution, which guarantees the right to receive a remedy for injuries or wrongs received.

COUNT FOUR (State Law Claim for Negligent Hiring, Supervision and Retention of Dr. Felix) (Against Defendant CMS)

56. Paragraphs 1 through 55 of this Complaint are incorporated by reference as if fully set forth herein.

57. CMS holds itself out as the nation's premier provider of healthcare services to prisons and jails and contracted with the State of Arkansas to provide healthcare services to inmates at all Arkansas correctional facilities, including the McPherson Unit. CMS, acting through its agents and employees, who were then and there acting within the scope of their employment, to render medical care and assistance to Virginia Morris, It became, mld was, the duty of the defendants to exercise reasonable care to see that all inmates, including Ms. Jones, received proper medical care and attention.

58. Defendant CMS had a duty to exercise reasonable care in the hiring, retention, training, and supervision of its employees in a manner that provided the inmates under CMS's care at McPherson with reasonable medical care and treatment.

59. CMS also had a duty to adequately train and supervise all CMS medical personnel employed at the McPherson Unit. Upon information and belief, and based on the above stated facts, it is alleged that CMS also failed to adequately train and supervise Dr. Felix.

60. The negligent hiring, supervision, training and retention of Dr. Felix as an independent physician at the McPherson unit and properly train other medical personnel was a proximate cause of injuries suffered by Tania Jones, which caused her death.

## Damages

61. As a direct and proximate result of the negligent acts of the defendants, Tania Jones suffered injuries which caused her death.

62. The Plaintiff, individually and as personal representative of the estate of Tania Jones, deceased, is entitled to recover for the following damages, all of which were proximately caused by the above-described conduct of the Defendants:

a. Pecuniary injuries suffered by him because of loss of contribution and support; loss of household services; loss of consortiulll (the society, services, companionship, and marriage relationship); and mental anguish.

b. pecuniary injuries , for mental anguish;

c. Conscious pain and suffering experienced by Tania Jones during the time she was under the care of CMS employees at the McPherson Unit and afterwards, prior to her death.

f. Punitive damages;

g. Funeral expenses.

h. Loss of life suffered by Tania Jones.

63. Jury trial requested.

WHEREFORE, the Plaintiff, individually and as personal representative of the estate of

Virginia Manis, prays for judgment against Defendants in an amount which will sufficiently

Compensate Tania Jones' estate her for her injuries and loss of life in excess of $75,000.00,

For costs, and all other just and proper relief.

Respectfully submitted,

The Law Offices of Peter Miller

1601 S. Broadway Street

Little Rock, AR  72206

501-374-6300

rscull@petermillerlaw.com

Tania L Jones
Medical records SVI admission date April 6, 2010
Discharge date April 7, 2010
Attending physician Fakhar Haz
Medical record #139927

Tania was admitted to the SVI following a syncopal episode. She was admitted from the women's prison unit no accompanying medical records. She had a history of insulin-dependent diabetes, paraplegia following an MVA, syncopal episode, incontinence, hypertensive, and on a number of medications.

On admission her EKG showed a tachycardia and an incomplete right bundle branch block. CT of the head and chest x-ray were negative. WBC was 11.7 with a hemoglobin 11.8 hematocrit of 35 platelets 202,000. Her sodium was 155 potassium 4.7 chloride 97 CO2 19 BUN 22 creatinine 1.6 upon and was over 2 BNP was 2681 and CPK was 923

The initial plan was to address her multiple medical problems. there was concern for seizure activity, slight metabolic acidosis and diabetic neuropathy .a BNP was requested with resultant 2681 indicating possible severe cardiac disease. A BNP of over 500 is considered positive and one at a level of 2681 is an extremely bad prognosis.

A PT, INR, PTT was ordered. This was done in anticipation of anticoagulation therapy. A repeat BNP was ordered for the following day with results of 4123 indicating severe underlying disease process that would be life threatening.

Before the results of the second BNP were available and before she could be heparinized and further studied she was ," handled like an animal", and removed from the hospital. At this point a number of things transpired. It was noted she was on amitriptyline 150 mg 3 times a day when before incarceration she was on 25 mg daily. She had been on amitriptyline, hydrochlorothiazide, Lasix,Indocin, Naprosyn, (should not be given together) Glucophage, Neurontin, baclofen, Colace, metropolis, vitamin E, magnesium citrate, Tagamet and sliding scale insulin. According to the patient the nurses did not give her all of her medications and some days she got nothing . There are handwritten notations in the medical records beside

EX. 1

11/02/2011 10:01 5012258564 BRECKENRIDGE FAMILY PAGE 06/07
Case 4:12-cv-00170-BRW Document 1 Filed 03/14/12 Page 12 of 14

(2)

the dictated and transcribed records. On page 6/116 one note relates that she was not monitored or tested long enough to complete an adequate diagnosis and she was discharged with an elevated CPK. Dr.Ijaz was not able to complete his medical assesment. On page 7 of 116 is a notation she was on telemetry and should not have been discharged. Repeated efforts were made to obtain medical records from the prison.

Dr. Jiaz was informed by the prison physician the patient was unreliable and a liar. The handwritten notations state she was not a liar but trying to get medical attention. At the time of her death she was crying out for help. Dr.Jiaz was told she would be admitted to the prison infirmary and receive medical attention. This did not happen. She was returned to the barracks. The only help she received was from other inmates. When medical records were requested there were none. There are 2 dictated death notes but nothing regarding medical care premortem..The notes are by the nursing staff. There are no physician records available.

In the handwritten notes the prison physician Dr. Felix told Dr. Ijaz that the patient was manipulative. He told Dr. Jiaz she had a previous extensive workup that was normal. I have not seen any records of this workup. In this conversation I do not know if Dr. Felix was told of the critical laboratory results or if asked. She should not have been discharged. There is a notation Dr. Felix discredited her complaints and commented she was psychotic (she died) On page 2 of 116 Dr. St. Felix advised Dr.Ijaz that he knew her well and she had a history of malingering. Dr. St. Felix also commented she could be sent back to the prison Hospital where they could watch her more closely and determine the reality of her symptoms. She was sent back to Dr. Felix. Dr. Felix was advised to repeat her CBC, BNP, CPK the following morning. Dr St. Felix was advised to continue amitriptyline, Neurontin, baclofen, Colace,, vitamin C, magnesium citrate, Tagamet, and her sliding scale insulin. There is no record any these medications were given or the the request for laboratory work was performed. It appears she was returned to the barracks and ignored until her death.

An autopsy was done ; she was found to have an acute pulmonary embolus. A diabetic, essentially untreated and followed with no laboratory work, plus paraplegia ,and an untreated hypertensive, would be at extreme risk.

Dr. Ijaz was not able to complete his workup before the patient was removed

(3)

*from the hospital. Anticoagulation was being considered. Her initial elevated BNP and repeat BNP of over 4000 could not have been fully evaluated during her short hospital stay. In addition, no medical records accompanied her to the hospital leaving the admitting physician virtually blind.*

*In essence, this 34-year-old woman has an episode of syncope, is admitted to the hospital where an appropriate workup and evaluation is underway. Before the evaluation can really get started, much less completed, she is picked up by the Arkansas Department of Corrections and any chance she had of survival. After discussing her case with Dr. Ijaz and assuring him she would be admitted to the infirmary for specific medical test and care she was instead sent to the barracks. Her medical care was provided by fellow inmates until her death.*

*An autopsy reveals pulmonary thromboembolism from an occlusive saddle embolus extending into bilateral pulmonary arteries not adherent to vessel walls. Residual thrombi were found within the left popliteal vein consistent with left lower extremity being the source of the thromboembolism. The pathologist attributed the manner of death to ," accident". However, this is qualified. " Occlusion of veins of the pelvis or lower extremities occur with increased frequency and individuals that are wheelchair-bound and or bedridden " requested information", regarding the circumstances under which the motor vehicle collision yielded no police report for documentation of the event. In the absence of information to the contrary it was assumed to be an accident." The pathologist apparently was not aware the motor vehicle accident was remote. The diagnoses of accident would not have been made had the pathologist had access to medical records. As did the doctor at the hospital he had to evaluate a complicated case without any medical records. The development of clots in the lower extremity are complicated by paraplegia, wheelchair confinement, and continued bed ridden condition all being a factor. A major factor in Ms. Jones case was the total lack of medical care. She was an insulin-dependent diabetic, hypertensive, and in extremis at St. Vincent's. An untreated or improperly treated diabetic is at increased risk for thromboembolism. Had the pathologist known about her medical history or her recent admission to St. Vincent's the opinion would be different. In any case, a thromboembolic phenomenon is an evolving process and does not occur with the abruptness of a gunshot wound. The evolution of thromboembolic phenomenon are well*

(4)

documented in medical literature. Acute embolic phenomenon simply means the clot broke from a distant vessel and traversed to the lung. It does not mean the whole process occurred abruptly. In the brief time she was at St. Vincent's the physician quickly realized an underlying problem but was not given the time to finish his evaluation or treatment.

I cannot believe that any pathologist would attribute this to accident if all medical records had been available. It seems that he was under the impression the MVA was an immediate factor.

Was appropriate care given to Ms. Jones by the Department of Corrections? From the records made available it appears that no care was given to her. Dr. Ijaz was told she would be admitted to the infirmary and they would be able to care for her. She was not admitted to the infirmary. She did not see a physician or a nurse on her return to the prison. Removing this woman from St. Vincent's and sending her to the barracks was a death sentence. Since there are no medical records I do not know of any medical care was provided prior to admission to St. Vincent's. Without providing appropriate medical care to a patient as complex as Ms. Jones she was guaranteed to have severe complications

I can only hope that there are existing medical records and she was provided appropriate medical care and that somewhere in the system someone in authority cared. When she cries out in pain or fear for her life was anyone listening? I certainly hope so.

Edwin Barron M.D.
November 1, 2011